Good morning, Your Honors. May it please the Court, Esther Murducaiba for the State Defendant. This Court will hear several cases this morning involving prohibitions on the carriage of firearms in certain locations. This is not one of them. New York's private property default rule does not bar carrying firearms in any location. It merely requires that a person obtain express consent from the proprietor before entering someone else's private property with a firearm. Is this an argument that there's really no state action? Is that what you're arguing? No, Your Honor. There is a state action in the form of a statute. I do agree with that. There is no standing here because the plaintiff's injury is not traceable to the statute. I'm not sure I understand that, whether you call it state action or standing. Isn't it the case that the day before this statute, and indeed the day before Bruin, the plaintiff could have entered Macy's, because he has a permit for a carry permit, right? He could have entered Macy's with no problem. Unless Macy's had a sign on the front saying we don't allow guns in here, he'd be fine. After this statute, he's no longer fine. Isn't it the statute that has made the difference? No, Your Honor. It is the decision of Macy's not to make its consent to the entry with firearms. How do you know they've made a decision? As opposed to just going on doing their business. They're in the business of selling shirts and underwear. They're not in the business of making public policy. Well, Your Honor, they are in the business of opening a store that is open to the public and operating against the background legal principles that govern all property owners. What the statute did is change the background legal principles that govern the decision making of property owners. Yeah, but why isn't that? But that is to the disadvantage of gun toters, yes? It is not, Your Honor, because the law is entirely neutral as to which decision the property owner makes. The law is entirely neutral. I mean, you know, I was struck by Mr. Christian's telephone calls to business owners. They said, we don't want to get involved. And it strikes me that that may be only a couple of people, but that seems to me to be entirely to be expected. Why would a property owner want to get in the middle of this either way? I mean, if you put the presumption on the other side, you know, you have actually from the First Amendment standpoint, I don't see any difference which way the presumption runs, because either way, if you want something, you have to ask for it. Whether the presumption is the gun bearer can come in to a public place or can't, whether that's the presumption or not, if you dissent from that or you want to have a different rule as a property owner, you But why isn't the presumption of the Second Amendment that he's supposed to be able to go in there unless there's an objection? This is not a private house. This is a place that is, generally speaking, open to the public. It becomes like the sidewalk. Well, because again, Your Honor, the default rule itself does not serve a determining factor as to the property owner's decision. This case is very similar to Tirani, where a person wanted to buy a gun from a firearm dealer. The dealer ran a background check. An FBI agent showed up at the dealer's door and said, we have some concerns about this person. We are not prohibiting you from selling him the gun, but we have some concerns. And the next day the dealer said, I can still sell you the gun. The FBI visited me and I no longer feel comfortable doing so. And what the Sixth Circuit concluded is that the firearm dealer's independent decision completely severed the chain of causation. The FBI agent did not jolt, coerce, or command the dealer in making that decision. And in this case, the default statute does even less than that. It imposes absolutely no consequences on a private property owner's decision. But even if Your Honors disagreed and concluded that there was standing here, the private property default rule does not implicate the Second Amendment for the reasons that the Eleventh Circuit concluded in Georgia Kerry in evaluating a very analogous statute. And in that case, the court rejected a facial Second Amendment challenge, holding that there is no Second Amendment right to carry firearms onto another person's private property against the wishes of the owner. And that a state statute that serves to vindicate that interest or that right does not give rise to a facial Second Amendment challenge. And does Georgia Kerry survive Bruin? Or what should we take from it in light of Bruin, I guess? It does survive Bruin, Your Honor. The court was very explicit there that it was deciding Georgia Kerry at step one of the inquiry, which Bruin did not displace. It was deciding whether that prohibition, the conduct regulated by that prohibition, falls within the scope of the Second Amendment. And Bruin did not displace the approach that courts had taken on that issue. In fact, Bruin blessed that approach to the extent it was guided and governed  by it. Would you say the same thing about the First Amendment? I mean, I assume that Mr. Macy could say, I don't want to serve communists in my store. And when a prominent communist came in, he said, please leave. I don't want to serve you. I assume that the private property owner could do that, right? Yes. And maybe even more precisely, both the district court and the plaintiffs agree in this case that a property owner has an absolute right to exclude anyone carrying guns. Right. So if the state passed a law saying no communists can go into stores in New York State unless the store puts up a sign saying, communists welcome, that doesn't cause any First Amendment problem at all in your view? I don't think that's what the statute does, Your Honor, to the extent you're attempting to draw an analogy. It says, unless you put up a sign saying, gun bearers not welcome, gun bearers are not welcome by order of the state. Well, again, Your Honor, the historical understanding of the First Amendment and the types of limitations that government can impose on speech or on expressive conduct are different than the types of limitations that governments can impose on the Second Amendment. And for all of the reasons that the Eleventh Circuit described. Yeah, but you're saying this isn't a restriction by the government on anybody's rights at all. That's right, Your Honor, because the historic understanding of the Second Amendment is different from the historic understanding of the First Amendment. And in this case, for the reasons that Georgia Kerry concluded, there was never an understanding of the Second Amendment to allow people to enter property absent somebody's wishes. And the statute in Georgia Kerry operated in functionally the same way. What that statute said is that if you wanted to enter a place like a place of worship with a gun, you had to notify security or management and follow the directions of security or management in temporarily storing your gun, securing it, and so forth. Our statute works in functionally the same way. If you want to enter private property with a gun, you have to give notice to the proprietor and get consent. It's sort of the equivalent of open carry in that respect, right? That one advantage of open carry laws is that at least everybody knows what they're dealing with. And here, if we're allowing concealed carry, then someone entering private premises, the premises owner is not on notice. Is that sort of what we're talking about here? I don't think so, Your Honor. I think the interest that is being protected by the Georgia statute and by New York statute is the interest in giving property owners all the information they need to assess the risks that are happening on their property. I know I'm almost out of time, but I would like to just briefly address the fact that even at step two of Bruin's inquiry, the state has met its burden by citing eight different historical provisions from seven different jurisdictions that also function to bar persons from entering private property with a firearm absent receiving consent. The plaintiffs and the district court have drawn various quibbles with the historical evidence, but none of those really overcome the historical tradition of these. Do any of them concern places that are otherwise open to the public? None of them actually make that distinction, Your Honor. And we think that's important because that reflects that there was no historic understanding of the Second Amendment that made that distinction in the way that the district court focused on. All of those statutes required somebody to receive consent, sometimes even in writing, from the property owner before entering their property with a firearm. The district court, in this case and in the Antonia, primarily characterized these statutes as... How many shops, how many stores, how many restaurants have people standing at the door vetting who is going to come in and who may not. A restaurant will vet who has a reservation. But your system would require there to be this additional person who is going to stand at the door and question people. Your Honor, the law does not require that. The law provides many different mechanisms by which an owner can give consent. They can post a sign. They can post a statement on their website. They can train their staff members, for example, taking reservations to state that they either provide consent or they do not provide consent. They can post a person like that outside the door, or they can have a recorded phone message. The statute provides many different mechanisms by which this expressed consent can be conveyed, which really reflects that the facial challenge here is doubly inappropriate. And I see that I'm over my time, so we'll reserve the rest for rebuttal. Thank you. Morning, Your Honors. May it please the Court, Pete Patterson for the appellees. New York's no-carry default is a paradigmatic example of the state's attempt to circumvent the Bruin decision. As academics who promoted this idea indicated, it has the potential to radically expand the number of de jure gun-free zones. But that is not a goal New York was permitted to pursue. Quickly on standing, this case is unlike every other case that the other side has cited on standing because it's a direct criminal prohibition on the plaintiff. The Tirani case, every other case, was an example where there was indirect harm. The government regulated somebody else, and that indirectly, allegedly, harmed the plaintiff. But that's not the case here. This is a direct criminal prohibition on the plaintiff in this case, and that gives rise to standing. What do we make, though, of the fact that liability is only possible at the action of a third party? Well, that's not true, Your Honor. The third party can do nothing. It's a no-carry default that says you are subject of a felony if you go into somebody else's property with a gun, unless they waive that prohibition. And it's similar to the structure in the Clinton v. City of New York case which we cited, which there was a Medicaid obligation that New York was going to have to bear. And then there was a law that removed that obligation, but the President did a line-item veto. Nevertheless, the HHS still could have waived that obligation, and there was, in fact, a waiver application in front of the HHS. But the Court said that that doesn't affect standing because there's the government action of removing the benefit in the first place. The fact that somebody else could waive it does not affect standing, and it's the same analysis here. With respect to the merits, first, plain text. The plain text gives individuals a right to carry. There's no locational distinction in the plain text. So we go to... Oh, wait, wait. I mean, that means that you carrying a gun could come into my house carrying a gun if I didn't want you to? That's with respect to the plain text. That's not even the plain text... Is that what the plain text means? That I can't say, I'm sorry, I don't want you in my house if you're carrying a gun? Yes, and that's what Bruin... No, well, the plain text does not establish the result. The plain text is only, is the second amendment implicated? Bruin is not a two-step test, it's a one-step test. First, you decide... It sounds like a two-step test. I mean, this is a little arcane. I guess it doesn't matter whether it's a two-step test or a one-step test. But you're saying, first we have this, and then we have that, and something's come into play at this stage, and something's come into play at that stage. Right. The first step, or the first stage, is, is the second amendment even implicated? And there, you look at the plain text. And as Bruin said, nothing in the plain text draws a home public distinction or a home anywhere else distinction. You're not going to find in the plain text a restriction on carrying anywhere. But then the government has the burden of history, and then so, for example, the court looked at sensitive places. That was a matter of history. And similarly... But my house is not a more sensitive place than any other house. Well, as a matter of history, I suspect you would not have the right to bring a firearm into someone's home. And we're going to say this is, you have a right to come in because, but maybe not because we suspect something? No, you're not going to, you do not have a right to bring a firearm into... Do you know what the likelihood of the situations actually are? You do not have a right to bring a firearm into someone's home without their, against their express consent, but that's because of history. It's not because of the plain text. That's the only point I'm making. And what history are you citing for that? I'm citing the historical laws that give property owners the right to say, we don't want someone to come in here with a gun or with anything else, for that matter. So that is the history, but... Basically trespass law. Yeah, it's basically trespass law. But here, this... You probably were getting ready to address that, but how is that distinct from what we're talking about private property store owners? Because again, this notion that in the briefs it says a lot about private property open to the public. And that distinction, I mean, it's as Judge Lind was alluding to, it's not in the text. And so if there's a reason, if private property open to the public cannot have this kind of consent requirement, why would that be any different with regard to private property regarding Judge Lind's home? It would be the same analytical structure. We do afford the home heightened protection and various constitutional rights. So perhaps that would be a different result for the home. But here we're speaking... Perhaps it wouldn't? Perhaps it wouldn't. We would have to do that analysis. We have brought a claim as applied only to places open to the public. So we have not run that analysis for homes. It could be a different outcome. But with respect to places open to the public, there is zero  But we're going to have to make a rule, you see, right? Yes. We're going to have to explain what the scope of the Second Amendment is. And you're suggesting that we should make a rule that governs private property open to the public, and then just say, well, I mean, maybe the same rule would apply to anybody's house. We can't tell? Well, you would say, as a matter of plaintext, individuals have, it's just a right to carry. And then it's the government's burden to prove that their restriction is consistent with the nation's history. And you would hold, with respect to places open to the public, the government has not met that burden. They would have an opportunity, if it was my home, to meet that burden, to have a rule like this in place. But they haven't tried to meet it in this case because that's not what it issued, is at issue in this case. So it would be, with respect to this rule, the government has not met the burden. And a very, the other side has cited the Georgia Kerry case. But the better precedent is the Brown versus Entertainment Merchants case in the First Amendment context in the Supreme Court, footnote 3, which was a law that barred the sale of violent video games to minors. And there was an argument that this is essentially just a parental consent law because the parents can still purchase the video games and give them to minors. And there was an argument that at the founding, parents had essentially complete control over children. So there can't possibly be a right of children to access these video games. And what the Supreme Court said in footnote 3 of that decision is, no, maybe if this law had said, for parents who object, then the state can enforce that. That would be okay. But this is different. We're inserting state authority, state control at the first step in saying you have to affirmatively seek parental consent. And the Supreme Court said the history does not support that. And that is the same result that is at issue here. The history simply does not support the state inserting itself and saying you need to affirmatively seek consent before you're able to carry somewhere. Their analogs are game laws from the founding, which the vast majority of them applied only to enclosed lands. These were not places where people generally had the right to be in the first place. And they all, the motivation was abusive hunting practices. And what's interesting here is the motivation, the why. Bruin says you look at the how and the why. The why is that now we have to comply with the Second Amendment after Bruin, and there are going to be a lot more people exercising their Second Amendment rights. So we need to do something about that. So that why is diametrically opposed. The harm is not any of New York's licensing process. The harm is interpreting that text. Don't we have to pay some attention to the why at the time? I mean, actually, lots of people had no right to bear arms at the time of the First Amendment. True? At the time of the Second Amendment, yes. There were some people. There were all people of color, for example. Yes, absolutely. But were prohibited from carrying guns. That's a lot of people. Well, and that is not reflective of the Second Amendment. That is reflective of the bigotry of that time. And it's interesting New York here is relying on provisions of the Black Codes. Well, whatever. I mean, so they were bigots. But they were bigots who did not think that lots of people had the right to bear arms. Right. But it's not. That's part of the historical understanding, isn't it? Right. But here we're not dealing with people who don't have the right to bear arms. What New York has been told. And as you said before, the hunting statutes, I'm quite in particular abuse. So when they saw an abuse, they were able to deal with it, notwithstanding any assumed right to bear arms. But when there was no particular abuse, I'm not sure that we have a lot of historical examples of people coming with guns into somebody's house against their will. Right. We don't have a lot of that, do we? And we're not claiming a right to come into anybody's house with a gun against their will. And what about stores? We're not claiming a right to come into a store against the store owner's will. What we're saying is that the state cannot bar us from going into a store unless and until that store affirmatively says that we can come in there. Historic trespass law, which we are not opposing, would say if someone says you can't, then we can't. Well, but except historic trespass law says you can't come in my house, period, unless I affirmatively consent. Right. You can't just say I'm assuming that I have the right to come into your house. Right. Yes. We're not saying we have a right to come into your house. But these are businesses open to the public. And Heller at Bruin used the phrase places frequented by the public repeatedly because New York, for one of the plaintiff's application, says you can have a right to carry, but not in places frequented by the public. So you are drawing a distinction between houses and places that are open to the public. Yes. And the technical point I was making is that that is a matter of history, not as a matter of the plain text does not draw any locational distinctions. So that is at the historical stage of the analysis. So that was the only distinction I was trying to draw, Your Honor. And my time is up, but I'm happy to answer any further questions. Thank you. Thank you. Hello, Your Honors. The plaintiff's argument regarding the meaning of the Second Amendment does not comport with the history of private property law that informed the historical understanding of the Second Amendment. As the court explained in Georgia Carey, the property rights, the historic property rights of owners of homes and owners of businesses were not distinguished with respect to the right to exclude gun owners. That is not reflected in the text of the Second Amendment, as plaintiffs agree. It is also not a distinction that is reflected in the underlying property law itself. And for that reason, this challenge fails at step one of the analysis. But doesn't the underlying property law make a pretty clear distinction between places where there is an open invitation to the public and places where there isn't? In other words, you can't go into Macy's without Macy's permission, but Macy's declares that it's open to the public. No one makes that assumption about my home, but they do make that assumption about Macy's, and for good reason, because Macy's wants customers. So what is the logic of saying that we assume, unless they declare otherwise, that Macy's doesn't want certain customers? Well, Your Honor, an assumption has to be made. In this context, property law would require a default rule as to the meaning of silence. Either it implies consent or it implies non-consent. Now, legislatures have the freedom to choose between which one they think is better as a policy matter. But for the plaintiffs to prevail here, you would have to conclude that the Second Amendment requires one of those defaults. And there is, again, nothing in the text of the Second Amendment or the historic understanding of the Second Amendment that mandates that conclusion. And with respect to plaintiffs' arguments about the quality of the state's historical evidence, there are just a few things that I would like to flag. Four of these laws do not mention hunting at all. All of these laws prohibit carrying guns onto someone else's private property, regardless of a hunting or anti-hunting motivation. At least two of the laws do not mention enclosed premises. And all of these laws, even if each of them was motivated by a concern about hunting, all of these laws support the state's ability to pass such a prohibition to address modern concerns and considerations, including about property damage to modern property and the lives of people on that property. Thank you. Thank you very much, Your Honors. Thank you. All right. Thank you both. We'll take this under advisement.